# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | |
|---|---|
| ADAM BERMAN, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:19-cv-356 |
| FAIRFAX COUNTY SCHOOL BOARD, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment.

Defendant Fairfax County School Board employed Plaintiff Adam Berman as a special education teacher from 2016 to 2018. Plaintiff was a "probationary" teacher during that time, subject to Defendant's discretion as to whether to renew his one-year employment contract after each school year. In June 2018, after Plaintiff's second year, Defendant determined that it would not renew Plaintiff's contract for the 2018 to 2019 school year. Plaintiff, who suffers from Autism Spectrum Disorder ("ASD"), subsequently filed this lawsuit alleging that Defendant subjected him to a hostile working environment (Count I) and wrongfully terminated his employment (Count II) in violation of the Rehabilitation Act of 1973.

Plaintiff was first diagnosed with ASD as a young child. Symptoms of ASD include feelings of worthlessness, difficulty forming relationships, difficulty recognizing social cues, and trouble controlling the volume of one's voice. Throughout his life, Plaintiff worked to control his symptoms and eventually became academically accomplished. Plaintiff received a doctorate degree from George Washington University and has experience speaking as a disability advocate, particularly in the autism community. After obtaining a teaching license, Plaintiff worked as a special education teacher for Prince George's County Public Schools from 2012 to 2015. After the 2015 school year, Plaintiff took a year off from teaching before applying to work for the Fairfax County school system in the summer of 2016.

Defendant hired Plaintiff in August 2016 as a "Multiple Disabilities Teacher" at Timber Lane Elementary School.[1] Plaintiff's duties included managing a caseload of several special education students, lesson planning, and facilitating his students' individualized education plans. As part of the individualized plans, Plaintiff was responsible for setting and tracking his students' goals and overall progress in the classroom.

---

[1] Despite his previous teaching experience at Prince George's County Public Schools, Plaintiff was still a "probationary" teacher when he was hired by Defendant because he had not completed at least three consecutive years of employment. Va. Code § 22.1-303.A; see also Corns v. School Bd., 454 S.E.2d 728, 732 (Va. 1995).

2

Special education teachers at Timber Lane Elementary do not have their own classrooms. Instead, special education teachers work with their students by "pushing in" or "pulling out" of general education classrooms. When a teacher "pushes in," he or she works with individual students within the general education classroom itself, working to ensure that the student understands the general education lesson being taught. Alternatively, special education teachers can "pull out" students so they can work outside of the classroom. Regardless of the method employed, Plaintiff's primary objective was to adapt the general education teacher's lesson and teach it to his students.

Plaintiff's performance was periodically observed by the principal or assistant principal, and as a probationary teacher, he was formally evaluated twice per year, including one end-of-year "summative" evaluation. The evaluations used by Defendant contained seven standards, an overall evaluation score out of 40 points, an overall rating classification, and a recommendation as to whether to renew the teacher's contract for the following school year. The seven evaluation standards are: professional knowledge, instructional planning, instructional delivery, assessment of student learning, learning environment, professionalism, and student academic progress. The overall score is based on individual scores assigned to each of the seven standards by the evaluator. An overall score of 10 to 19 is categorized as "ineffective" and

an overall score of 20 to 25 is categorized as "developing or needs improvement." Teachers receiving scores greater than 25 are considered either "effective" or "highly effective." If, however, a teacher received poor evaluations on three or more of the standards, he or she would be categorized as "developing or needs improvement" regardless of their overall score. The Defendant's policy states that teachers are expected to perform at an "effective" level.

After Plaintiff began his employment at Timber Lane Elementary, Plaintiff was observed on October 12, 2016 by the Timber Lane Elementary School principal, Kimberly Cook. During the observation, Cook noted some concerns about whether Plaintiff could effectively teach the general education lesson to his students and opined that Plaintiff should lower the tone of his voice while teaching. After her observation, Cook also referred Plaintiff to a colleague assistance program and assigned him a mentor. Roughly one week later, one of Plaintiff's colleagues informed Cook that he had taken over some of Plaintiff's teaching responsibilities because Plaintiff felt that he was overwhelmed.

Throughout the fall of 2016, Cook and the school's assistant principal, Lisa O'Donovan, continued to observe Plaintiff and note various performance related issues, in addition to recommending that Plaintiff lower the volume of his voice while working at the school. On November 1, 2016, O'Donovan sent Plaintiff an email

4

stating specifically that she "expect[ed] all students to be silent in the hallway" and asked him to "model th[at] behavior by speaking quietly." Plaintiff was again observed on November 9, 2016 by O'Donovan. During that observation, O'Donovan again noticed that the volume of Plaintiff's voice was distracting other students in the classroom and again suggested that he use a more appropriate tone. Midway through the 2016 to 2017 school year, Plaintiff's caseload was reduced, ostensibly because of continued performance problems. After a February 16, 2017 observation, O'Donovan noted that Plaintiff's students seemed disinterested and unengaged.

Plaintiff's formal evaluations at Timber Lane Elementary were performed by Cook and O'Donovan. On Plaintiff's mid-year evaluation, Plaintiff was rated as "developing or needs improvement" on five of the seven evaluation standards and received an overall score of 22 out of 40. On Plaintiff's year-end evaluation, which echoed many of the same performance deficiencies revealed by the prior observations and in his mid-year review, Plaintiff received an overall score of 20 out of 40. Plaintiff's year-end review specifically stated that he needed to "become more familiar with the FCPS resources available to him" and should "collaborate more closely with colleagues . . . , share teaching ideas, and look closely at student work and data." Plaintiff's overall score on his year-end evaluation was one point shy of an

5

"ineffective" rating, although the evaluation ultimately recommended a contract renewal for the following school year.

Despite the recommendation for a contract renewal, Plaintiff was subsequently "de-staffed" from Timber Lane Elementary prior to the 2017 to 2018 school year. The Plaintiff does not allege any discrimination stemming from Defendant's decision to "de-staff" him from Timber Lane Elementary, and the parties appear to agree that Defendant's de-staffing decision resulted from staffing needs alone. As part of the process to find a new job after he was de-staffed, Plaintiff distributed a copy of his resume and a cover letter to various Fairfax County School administrators, including to then-assistant principal of Parklawn Elementary School, Larry Aiello. Plaintiff's resume and cover letter indicated that he has autism, and Defendant concedes that school administrators were generally aware that he had ASD. Plaintiff was eventually re-appointed as a multiple disabilities teacher at a new school, Westlawn Elementary School, for the 2017 to 2018 school year. Later that same year, Aiello became the vice principal at Westlawn Elementary School.

Prior to commencing his employment at Westlawn Elementary, Plaintiff met with the school's principal, Linda Ferguson. Plaintiff disclosed to Ferguson that he had some difficulties during his employment at Timber Lane Elementary and that he hoped to find a job teaching algebra at a middle school. After the

6

meeting, Ferguson shared other teaching vacancies in Fairfax County Public Schools and offered to help Plaintiff find a middle school algebra teaching position. Plaintiff did not pursue any other teaching options at that time, but sometime after learning of Plaintiff's difficulties at Timber Lane Elementary, Ferguson decided to put Plaintiff on a reduced caseload to begin the 2017 to 2018 school year. The Defendant contends that Plaintiff's performance issues persisted, and Ferguson was never able to put Plaintiff on a "full" caseload.

On September 21, 2017, Aiello first observed Plaintiff's classroom and noticed that one of his students was speaking loudly. When Plaintiff tried to counsel the student to lower his voice, the student began to yell. The following month, Ferguson learned that Plaintiff had not been certified in providing reading instruction, so she asked him to enroll in one of the school's available reading certification programs. Plaintiff responded and agreed that he would enroll in a reading program and also stated that he was working to improve his body language and control the volume of his voice. There is no evidence in the record that, at any point, Plaintiff indicated that he felt any of the feedback he received regarding the volume of his voice was discriminatory or otherwise hostile.

Later in October of 2017, Plaintiff's "buddy mentor" reported that she had provided Plaintiff with some recommendations but that

7

Plaintiff appeared uninterested in her feedback. On October 25, 2017, Plaintiff was referred to a second colleague assistance program. The evidence shows that Ferguson and Aiello referred Plaintiff to the program because of concerns about Plaintiff's ability to instruct his students, ability to utilize the school's "pacing guides" in his lesson planning, ability to consistently monitor his students' growth toward their goals, and ability to use an appropriate tone of voice when interacting with peers and students.

Plaintiff was again observed by Aiello in November 2017. Aiello observed that Plaintiff completed work for students that were struggling instead of helping those students complete the work themselves. Later that same month, Ferguson and Aiello met with Plaintiff to discuss his performance. In the meeting, Ferguson and Aiello expressed concerns regarding an inaccurate progress report that Plaintiff sent to a parent, the volume of his voice while he taught, and that he appeared condescending toward his colleagues.

During a meeting in November, Ferguson showed Plaintiff a tiered "volume chart." The chart was normally used as a teaching aid to help students learn to speak with an appropriate tone in school. The parties dispute what Ferguson said when she showed Plaintiff the volume chart. Plaintiff argues that Defendant used the chart to show him what level of voice he should use, while

Defendant argues that Ferguson showed Plaintiff the chart to suggest that he demonstrate to his students the appropriate level of voice to use in school.

In January 2018, Aiello began meeting weekly with Plaintiff to try to assist him with his performance. During an observation on January 16, 2018, Aiello noticed that one of Plaintiff's students rarely spoke. When Aiello followed up with Plaintiff after the observation, he recommended that Plaintiff incorporate visual directions in his lessons. On January 23, 2018, Ferguson observed Plaintiff teaching in a classroom and stated in a follow up message to Plaintiff that his work was "distracting" and recommended that he be more mindful of the rest of the class while teaching. After several of the weekly meetings with Plaintiff, Aiello memorialized the performance issues that were discussed. Aiello's memorandums frequently cited issues regarding Plaintiff's ability to formulate lesson plans and track his students' progress toward their individualized goals.

Plaintiff's mid-year evaluation was performed by Aiello on February 9, 2018. Plaintiff earned a score of 27 out of 40, but an overall rating of "developing or needs improvement" because he received poor evaluations in three of the seven grading standards. Plaintiff's mid-year review cited problems with his ability to give instruction, lesson planning, and failure to adequately track his student's progress toward their individualized goals. The

9

review also discussed concerns resulting from Plaintiff's classroom disruptions but indicated that Plaintiff was working to "utilize the appropriate tone."

In February of 2018, Plaintiff's performance issues persisted when Aiello observed two meetings between Plaintiff and the parents of two of his students. In both meetings, Aiello observed that Plaintiff did not give the parents any time to share their own observations regarding their child's performance and forgot to have the parents fill out required documentation to close out the meeting.

On April 13, 2018, Ferguson and Aiello completed Plaintiff's year-end evaluation, assigning him an overall score of 21 out of 40 and re-stating many of the same performance deficiencies that plagued Plaintiff since his first year of employment with Defendant. By letter dated June 14, 2018, Defendant informed Plaintiff that his contract would not be renewed. Plaintiff subsequently filed this lawsuit.

Under Federal Rule of Civil Procedure 56, a court should grant summary judgment if the pleadings and evidence show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party. See Anderson

10

v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made, the opposing party has the burden to show that a genuine dispute of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). This Court finds this case is ripe for summary judgment.

Defendant generally argues that it is entitled to summary judgment on Plaintiff's hostile working environment claim (Count I) because Plaintiff has not suffered any severe and pervasive harassment. Defendant also argues that it is entitled to summary judgment on Plaintiff's wrongful termination claim (Count II) because Plaintiff was not meeting the Defendant's legitimate performance expectations at the time of his "discharge." Plaintiff responds by contending that Defendant's consistent criticism of Plaintiff's inability to control the volume of his voice created a subjectively and objectively severe and pervasive working environment. Plaintiff also argues that Defendant's non-discriminatory explanation for his discharge was pretextual.

Employment discrimination claims brought under the Rehabilitation Act are evaluated using the same standards as claims brought under the Americans with Disabilities Act. Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 413 (4th Cir. 2015). Accordingly, to prevail on a hostile work environment claim under the Rehabilitation Act, a plaintiff must establish that: (1) he is a

qualified individual with a disability; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists for imputing liability to the employer. Fox v. GMC, 247 F.3d 169, 177 (4th Cir. 2001).

To establish that the allegedly harassing behavior was sufficiently severe and pervasive, a plaintiff must show that the conduct was both subjectively and objectively hostile. Fox, 247 F.3d at 178. As to the objective component, the allegedly harassing conduct must be considered hostile to a "reasonable person." Id. Factors to be considered are the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The harassing conduct is considered severe and pervasive when "the workplace is permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Defendant argues that the alleged harassment was not sufficiently severe or pervasive, but Plaintiff responds that because he was subject to near-constant criticism based on the volume of his voice - an undisputed symptom of his disability - that such criticism was sufficiently severe and pervasive. The Court finds that the comments regarding the volume of Plaintiff's

voice were not subjectively or objectively severe or pervasive. To begin, the Court is hard-pressed to find that the comments were subjectively hostile when Plaintiff agreed with his supervisors that he need to better control his voice to avoid disrupting the classroom. The record shows that Plaintiff repeatedly acknowledged that he should and would work to control the volume of his voice and that it could be distracting to the other students. The Court also finds that the comments are not objectively severe. Courts interpreting the objective severity component must consider whether the conduct is so severe that it "interferes with an employee's work performance." Fox, 247 F.3d at 178. The allegedly harassing behavior must also be "deeply repugnant, not merely unpleasant." Edmonson v. Potter, 118 F. App'x 726, 730 (4th Cir. 2004). Here, there is no evidence in the record that the allegedly harassing comments affected his work performance or were physically threatening. Even after construing the evidence in a light most favorable to the non-moving party, the Court finds that the Defendant is entitled to summary judgment on Plaintiff's hostile working environment claim (Count I) because the allegedly harassing conduct is not sufficiently severe and pervasive.

Much like the hostile working environment claim, courts in the Fourth Circuit analyze wrongful termination claims under the Rehabilitation Act as they would a discrimination claim made under the Americans with Disabilities Act. Reyazuddin, 789 F.3d at 413

13

(4th Cir. 2015). Where a defendant "disavows any reliance on discriminatory reasons" for the discharge, Courts routinely analyze wrongful termination claims made under the Rehabilitation Act using the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that test, a plaintiff must first meet the initial burden of showing that: (1) he was in the protected class; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met the defendant's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Ennis v. Nat'l Assn of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). If a plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate some legitimate, nondiscrimination explanation that would support a finding that unlawful discrimination was not the cause of the employment action. Id. If, on the other hand, an employer does not disclaim reliance on a plaintiff's disability for the reasons for the discharge, the prima facie case requires a plaintiff establish that: (1) he has a disability; (2) he is "otherwise qualified" for the job; and (3) the adverse employment action constitutes unlawful discrimination on the basis of the disability. Id. at 56; see also Tyndall v. National Educ. Ctrs., 31 F.3d 209, 212 (4th Cir. 1994). Here, Defendant contends that it terminated Plaintiff for reasons

14

relating to his performance, not his disability. For that reason, the Court proceeds by analyzing the McDonnel Douglas framework.

Defendant argues that it is entitled to summary judgment on Plaintiff's wrongful termination claim because he cannot meet his initial burden of showing that he was meeting the legitimate performance expectations at the time of his discharge and that his termination does not raise any reasonable inference of discrimination. Plaintiff responds by asserting that the decision to terminate him was pretextual because there are several inconsistencies and otherwise positive comments in his performance feedback.

At the outset, the Court finds that Plaintiff was not terminated by Defendant. Although Defendant states that Plaintiff's employment was "terminated," it is apparent from the record that Plaintiff's one-year probationary employment contract simply expired. Under Virginia law, Plaintiff was not entitled to any contract renewal and Defendant was under no obligation to retain him as a teacher for the following school year. See Va. Code § 22.1-303 and § 22.1-305.H. Plaintiff's employment contract made clear that his employment would expire on June 30, 2018, and the evidence shows that is exactly what happened.[2]

---

[2] Even if Defendant was terminated and it relied on Plaintiff's disability in making that determination, Plaintiff was not "otherwise qualified" for his employment. Although Plaintiff's academic record is unquestionably superb, the test for whether he is "otherwise qualified" generally requires that he is capable of performing the job despite the symptoms of his disability.

15

Even if Plaintiff had been "terminated," the Court also finds that evidence shows that Plaintiff was not meeting the Defendant's legitimate performance expectations. In addition to the performance issues cited during the observations, Plaintiff's mid-year and year-end evaluations showed that he was not meeting an "effective" rating under several of the evaluation standards used by Defendant. Importantly, when analyzing whether a plaintiff is meeting the employer's legitimate performance expectations, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 518 (4th Cir. 2006) (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000)). A plaintiff's disagreement with an employer's criticisms is not relevant because the inquiry is not whether an employer's assessments of a plaintiff were accurate. Hawkins, 203 F.3d at 279-80. It is well-established that a court is not a "super-personnel department weighing the prudence of employment decisions[.]" Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998). A plaintiff's own testimony cannot establish any genuine issue of fact as to whether he was meeting his employer's expectations. See

---

Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."). It appears from the undisputed evidence that Plaintiff's inability to control the volume of his voice was disrupting to the other students and the school's learning environment.

King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). This is the case here: Plaintiff may disagree with some of Defendant's performance criticisms, but the record shows that he was not meeting many of Defendant's clear-cut standards used to evaluate probationary teachers. While it is true that Plaintiff was re-appointed after the 2016 to 2017 school year and that his evaluations included some positive remarks, his evaluations also contained many of the same performance deficiencies. That Plaintiff's contract was renewed for a second year does not necessarily mean that he was meeting the legitimate performance expectations of Defendant at the time he was "discharged." Because the Court finds that Plaintiff was not terminated and that he was not meeting Defendant's legitimate performance expectations, Defendant is also entitled to summary judgment on Plaintiff's wrongful termination claim (Count II).

For the forgoing reasons, this Court finds that Defendant is entitled to summary judgment. An appropriate order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
January 28, 2020

17